UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PARAMJEET S. MALHOTRA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT D. STEINBERG, et al.,<br><br>Defendants. | CASE NO. C09-1618JLR<br><br>ORDER GRANTING MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION |

This matter comes before the court on Defendant John L. Scott's ("JLS") motion to dismiss for lack of subject matter jurisdiction. (Mot. (Dkt. # 173).) JLS argues that this *qui tam* action under the False Claims Act ("FCA") should be dismissed because it falls under the FCA's "public disclosure bar," which strips district courts of subject matter jurisdiction to hear certain FCA claims. Having considered the submissions of the parties, having conducted an evidentiary hearing, and having considered the relevant law, the court GRANTS JLS's motion (Dkt. # 173), dismisses the case with prejudice, and denies all pending motions as moot (Dkt. ## 164, 167, 170, 179, 182).

ORDER- 1

## I. BACKGROUND

This is an action under the False Claims Act ("FCA"). The FCA is designed as a tool to combat fraud against the federal government. *Seal 1 v. Seal A*, 255 F.3d 1154, 1158 (9th Cir. 2001). Under the FCA, the United States can bring an action against a party that has made false claims to defraud the government. *Id.* (citing 31 U.S.C. §§ 3730(a), (b)). One unique feature of the FCA is that private parties, not just the government, can bring claims under it. *Id.* A private party with knowledge of fraud against the government can bring an action as a *qui tam* relator and, if the action is successful, will be entitled to a share of the recovery. *Id.* (citing 31 U.S.C. §§ 3730(d)(1), (2)). The purpose of the FCA's *qui tam* provisions is to encourage insiders with knowledge of fraud to act as whistleblowers and come forward with information that will uncover the fraud. *Id.* (citing 31 U.S.C. § 3730(d)).

Since the FCA was passed in 1863, it has been amended twice in ways that are highly relevant to this case. In 1943, Congress amended the FCA to address the problem of "parasitic" *qui tam* suits which sought only to earn money by capitalizing on information already known to the government. *Id.* To achieve this goal, Congress stripped courts of subject matter jurisdiction to hear *qui tam* FCA claims based on information already in the government's possession. *Id.* at 1158-59. However, this jurisdictional bar turned out to be too onerous because it discouraged would-be relators from sharing information with the government, thereby frustrating the original purpose of the FCA. *Id.* Thus, in 1986, Congress again amended the FCA in an attempt to find a "'golden mean between adequate incentives for whistle-blowing insiders with genuinely

valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own.'" *Id.* (quoting *United States ex rel. Devlin v. California*, 84 F.3d 358, 362 (9th Cir. 1996)).

Congress's "golden mean" solution was the so-called "public disclosure bar" and its "original source" exception. The public disclosure bar strips courts of subject matter jurisdiction to hear *qui tam* FCA claims based on publicly-disclosed information unless the relator was the original source of the information:

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4). The statute goes on to define "original source":

> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

*Id.* This case requires the court to apply the public disclosure bar and its original source exception. For the most part, the law that applies to this case is the same as it was in 1986[1] and, as a result, this case requires only a straightforward application of relatively well-settled Ninth Circuit case law.

//

---

[1] Congress has amended the FCA since that time, but the parties agree those amendments either do not apply to this case or do not affect the court's analysis. (*See, e.g.*, Mot. at 3 n.1.)

ORDER- 3

## II. FACTS

The FCA claim at issue in this case involves a former bankruptcy trustee, Robert Steinberg, who allegedly defrauded the United States government by orchestrating an illegal kickback scheme connected to sales of real property in bankruptcy proceedings. (2d Am. Compl. (Dkt. # 108) ¶¶ 1-3.) Plaintiffs, Paramjeet and Sunita Malhotra ("the Malhotras"), are private individuals proceeding on behalf of the United States under the FCA. (*Id.* ¶ 10.) On this motion, the parties dispute the extent to which the information giving rise to this claim was publicly disclosed, and whether the Malhotras were an original source of the information.

The Malhotras first encountered Mr. Steinberg in 2006 when he was appointed trustee of their bankruptcy estate on December 5, 2006. (*Id.* ¶¶ 85, 87.) The Malhotras had a "negative initial 'gut reaction'" to Mr. Steinberg (Compl. (Dkt. # 1) ¶ 5.2), and began investigating his activities (2d Am. Compl. ¶¶ 91-93). For six months, from December 2006 through early 2007, the Malhotras allegedly searched "thousands of documents, personally inspected records of his handling of numerous bankruptcy estate properties, and interviewed debtors, witnesses, and Steinberg's business associates." (*Id.* ¶ 93.) The Malhotras allege that their "dogged investigation uncovered a widespread and methodical fraudulent conspiracy on the bankruptcy court . . . ." (*Id.* ¶ 94.) This conspiracy would eventually form the basis of the Malhotras' FCA claim.

However, the details and the timing of the Malhotras' investigation are disputed by the parties, and many of these details are critical to determining whether the court has subject matter jurisdiction. For this reason, on January 31, 2013, the court conducted an

evidentiary hearing to decide disputed factual issues related to subject matter jurisdiction, the public disclosure bar, and the original source exception. The following facts are supported by evidence heard at the evidentiary hearing and represent the court's findings of fact in this case.

Just as they claim, the Malhotras performed an independent investigation of Mr. Steinberg in 2006 and 2007. In this investigation, the Malhotras examined numerous publicly-available documents, mostly bankruptcy records, and drew inferences based on information contained therein. Specifically, the Malhotras began to suspect that Mr. Steinberg was engaged in straw-man transactions with numerous real estate agents who were his "partners." During their investigation, the Malhotras developed "suspicions" toward Mr. Steinberg. This word, "suspicion," was used repeatedly at the evidentiary hearing and permeates the parties' documentary submissions in this case. Mr. Malhotra himself characterized his suspicions as a "gut feeling" and said that he was just "shooting in the dark" with respect to Mr. Steinberg. (*See, e.g.,* Fandel Decl. (Dkt. # 174-1) Ex. A at 42-43, 47-48, 69, 144, 148, 178-179.) In addition to Mr. Malhotra's testimony, there is a substantial amount of evidence supporting the conclusion that, after their investigation, the Malhotras were merely "suspicious" of Mr. Steinberg but had no actual knowledge or proof of his fraudulent activities. Thus, the court adopts the following as a finding of fact: after their initial investigation of Mr. Steinberg, the Malhotras were merely "suspicious" of Mr. Steinberg and did not have true knowledge of his activities even though their suspicions were based on their investigations of and interactions with Mr. Steinberg.

In December, 2006, the Malhotras met with Mark Weber from the Office of the United States Trustee ("OUST") to share their suspicions about Mr. Steinberg. Mr. Weber was Mr. Steinberg's supervisor at the time. This was the first of several meetings the Malhotras had with Mr. Weber, but Mr. Weber testified that he remembers very little about these meetings. Mr. Weber testified that the Malhotras expressed dissatisfaction with Mr. Steinberg and how he was handling their bankruptcy estate, but that they did not make any specific allegations that Mr. Steinberg was secretly profiting from the arrangement or receiving kickbacks from real estate agents. Ms. Malhotra testified to the contrary, but provided no documentary evidence to support her assertions. The court finds the government's direct, specific testimony more credible than Ms. Malhotra's undocumented assertions. Mr. Weber testified that these meetings with the Malhotras did nothing to help uncover the allegations of fraud against Mr. Steinberg and did nothing to lead to the deposition several years later which would confirm the Malhotras' suspicions. The court credits this testimony. Nevertheless, Mr. Weber was "interested" in the Malhotras' information and encouraged them to investigate further, although he did not act on their information. Meanwhile, the Malhotras continued to investigate.

On May 30, 2008, OUST received a letter from an individual named Morrie Bennett, a former employee of Mr. Steinberg. Mr. Bennett's May, 30, 2008, letter details specific allegations against Mr. Steinberg and provides documentary evidence of Mr. Steinberg's fraudulent real estate scheme. The letter refers to specific transactions in which Mr. Steinberg received kickbacks from real estate agents in connection with sales of real property.

1    As a result of Mr. Bennett's letter, OUST began investigating Mr. Steinberg
2 almost immediately. Shortly thereafter, OUST suspended Mr. Steinberg from his work
3 as a bankruptcy trustee. Mr. Weber testified that it was "solely" Mr. Bennett's letter that
4 triggered OUST's investigation of Mr. Steinberg and his subsequent suspension. The
5 court credits this testimony, finding that it was not the Malhotra's information but Mr.
6 Bennett's letter that "triggered" OUST's investigation of Mr. Steinberg.
7    In the course of its investigation, OUST decided to depose Jim Grace, one of the
8 real estate agents alleged to be involved in Mr. Steinberg's scheme. In order to conduct a
9 deposition, OUST used a procedural mechanism called a Bankruptcy Rule 2004
10 deposition. To conduct the Rule 2004 deposition, OUST needed to find an open
11 bankruptcy case involving both Mr. Steinberg and Mr. Grace while Mr. Grace was
12 working for JLS (Mr. Grace had since started working for Defendant RE/MAX). OUST
13 could locate only one such open bankruptcy, and it belonged to the Malhotras. Thus,
14 OUST initiated a Rule 2004 deposition of Mr. Grace in the Malhotras' bankruptcy.
15    Mr. Grace's deposition turned out to be the "public disclosure" the parties are now
16 fighting about in this case. The Malhotras called OUST and asked if they could attend
17 the deposition. Because the deposition was technically noted in the Malhotras' case,
18 OUST told the Malhotras that they could be present, and that OUST could not prevent the
19 Malhotras from attending. The Malhotras attended. As it turned out, the deposition
20 marked a turning point in the Malhotras' investigation, crystallizing their "suspicions" of
21 Mr. Steinberg's kickback scheme into "proof." (Fandel Decl. at 42-43, 69, 179.) At the
22 deposition, Mr. Grace made specific allegations that he paid referral fees (i.e., kickbacks)

ORDER- 7

1 to Mr. Steinberg as part of the ordinary course of dealing between the two parties. This
2 was new information for the Malhotras. Ms. Malhotra described Mr. Grace's deposition
3 as an "ah-ha" moment. The court finds credible the substantial amount of evidence
4 (including Ms. Malhotra's own testimony) that the Malhotras had no knowledge of Mr.
5 Graces's fraud before the Grace deposition, but instead only "suspicions." The court
6 pays particular attention to the fact that, before the Grace Deposition, the Malhotras
7 suspected many people of wrongdoing but had no proof with respect to any of them. The
8 Malhotras' suspicions regarding kickbacks were just one among many of their suspicions.
9 It was not until the Grace deposition that this suspicion became more concrete than the
10 others in the case. The reason this suspicion became concrete while others remained
11 mere suspicions is because OUST deposed Jim Grace.

12     On this motion, JLS argues that the court lacks subject matter jurisdiction over this
13 case because the deposition of Mr. Grace was a "public disclosure" triggering the public
14 disclosure bar. (Mot. at 3.) Thus, they argue that the Malhotras' FCA lawsuit is barred
15 by the public disclosure bar and parasitic in the sense that it seeks only to capitalize on
16 information the government already knew. (*Id.* at 3.) The Malhotras dispute this
17 characterization, but more importantly, they argue that it does not matter whether there
18 was a public disclosure because the Malhotras were an "original source" of the fraud
19 allegations against Mr. Steinberg. (Resp. (Dkt. # 193) at 15-21.) They argue that their
20 investigation of Mr. Steinberg gives them original source status, and therefore that the
21 court has subject matter jurisdiction. (*Id.*)
22

### III. ANALYSIS

A *qui tam* relator under the FCA has the burden of establishing subject matter jurisdiction by a preponderance of the evidence. *United States ex rel. Bly-Magee v. Premo*, 470 F.3d 914, 916 n.2 (9th Cir. 2006). The court presumes a lack of subject matter jurisdiction until the plaintiff proves otherwise. *Stock West, Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1225 (9th Cir. 1989). In a factual attack on jurisdiction like this one, the court must resolve issues of fact that are material to determining whether there is subject matter jurisdiction[2] and may rely on affidavits, evidence heard at evidentiary hearings, and similar evidence in doing so. *Safe Air for Everyone v. Mayer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

#### A. Two-Part Public Disclosure Bar Inquiry

In the Ninth Circuit, courts analyze the public disclosure bar using a two-part inquiry that examines (1) whether there was a public disclosure and (2) whether the plaintiff was an original source of the information. *Seal 1*, 255 F.3d at 1159. Here, the court analyzes each of these questions in turn, finding that there was a public disclosure and that the Malhotras were not an original source for purposes of the FCA.

##### 1. Part 1: Public Disclosure

First, the court must determine whether, at the time the *qui tam* complaint was filed, there had already been a "public disclosure" of the allegations or transactions

---

[2] This is true unless the jurisdictional issues are so intertwined with substantive issues that resolving jurisdictional facts would also resolve factual issues going to the merits of the case. *See Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983). That is not the situation here because the jurisdictional issues are distinct from the substantive issues and the court can determine whether there is jurisdiction without finding facts critical to the merits.

forming the basis of the FCA claim. This first step in the two-step inquiry is typically not hard to meet, and has been described as a "quick trigger to get to the more exacting original source inquiry." *Hagood v. Sonoma Cnty. Water* Agency, 81 F.3d 1465, 1476 n.18 (9th Cir. 1996). Nevertheless, the court will examine each part of this step to be sure it has been met. To satisfy this first step, a court must determine (1) that a disclosure was made through a method specified in the statute; (2) that the disclosure was "public"; and that (3) the FCA claim is "based upon" the public disclosure. *Seal 1*, 255 F.3d at 1159; *United States v. Johnson Controls, Inc.*, 457 F.3d 1009, 1013, 1017 (9th Cir. 2006).

All of these conditions are met here. First, the alleged disclosure (the deposition of Jim Grace) was made through a method specified in the statute. Specifically, it was made during a government "investigation." Ninth Circuit case law is very clear that the term "investigation" encompasses "any kind of government investigation—civil, criminal, administrative, or any other kind." *Seal 1*, 255 F.3d at 1161. Thus, "investigation" is easily broad enough to encompass the OUST investigation into Mr. Steinberg's conduct. (*See* Weber Decl.) Plaintiffs argue for the first time on a recent motion for reconsideration that OUST's investigation is not an "investigation" for FCA purposes because it was not statutorily authorized independent of ongoing bankruptcy proceedings. (*See* Mot. for Recon. (Dkt. # 227); Order Denying Mot. for Recon. (Dkt. # 233).) This argument not only ignores the broad language of *Seal 1*, it also ignores the facts of this case: here there were, in fact, ongoing bankruptcy proceedings, and furthermore OUST had statutory authority to conduct its investigation of Mr. Steinberg

pursuant to 28 U.S.C. § 586. The court rejects Plaintiffs' arguments on this issue which, in any event, come too late.

Second, the disclosure was "public." Ninth Circuit case law is equally clear on this point: "Disclosure of information to one member of the public, when that person seeks to take advantage of that information by filing an FCA action, is public disclosure." *Id.* at 1162. In other words, a disclosure is public if it is made "to an outsider to the investigation who now seeks to profit from it as an FCA relator . . . ." *Id.* Here, the disclosure was public because the Malhotras were present to hear it (*see* Mot. at 16), they were outsiders to the investigation,[3] and they subsequently brought a claim under the FCA. Plaintiffs' arguments to the contrary are not grounded in Ninth Circuit law and are not well taken, including Plaintiffs' untimely argument made in its motion for reconsideration. (*See* Resp. at 21-23; Mot. for Recon.; Order Denying Mot. for Recon.)

Finally, the Malhotras' FCA claim was "based upon" the disclosure. As above, the term "based upon" is defined broadly under Ninth Circuit law: "A *qui tam* action is 'based upon' a public disclosure within the meaning of the statute if the allegations or transactions of the complaint have been publicly disclosed and the *qui tam* action follows, even if the *qui tam* action allegations were not 'derived from' the public disclosure." *Johnson Controls*, 457 F.3d at 1017. "Thus, . . . an individual with information about fraud against the government will be barred from bringing suit . . . even if she found out

---

[3] As a factual matter, the court finds (based on evidence heard at the evidentiary hearing) that the Malhotras were "outsiders" to OUST's investigation of Mr. Steinberg. *Cf. Seal 1*, 255 F.3d at 1162 (relator was an outsider to the investigation even though he was involved with it, and the government relied on his expertise to some degree to uncover the underlying fraud).

about the allegations in her complaint not from the public disclosure but from another source (such as an informant)." *Id.* Under this permissive standard, there can be little doubt that the Malhotras' FCA claim is "based upon" the public disclosure in the sense that it followed the disclosure, involves identical subject matter, and relies on many of the allegations that first became known at Mr. Grace's deposition. (*See* Fandel Decl. at 42-43, 69, 179.)

As shown, the court finds that the conditions establishing a "public disclosure" have been met in this action. Having completed step one of its inquiry, the "quick trigger" step, the court now turns to the "more exacting" second step of the public disclosure bar analysis—the original source inquiry. *Hagood*, 81 F.3d at 1476 n.18.

2. Part 2: Original Source

The FCA defines an "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4). In the Ninth Circuit, this has been interpreted as requiring three different showings: (1) that the relator has direct and independent knowledge of the information on which the allegations are based; (2) that the relator voluntarily provided the information to the government before filing his or her *qui tam* action; and (3) that the relator "had a hand in the public disclosure of allegations that are a part of . . . the suit." *Johnson Controls*, 457 F.3d at 1013 (quoting *United States ex rel. Lujan v. Hughes Aircraft Co.*, 162 F.3d 1027, 1033 (9th Cir. 1998)).

In this case, the parties do not dispute the second of these criteria and the court finds that it has been met. Accordingly, the court focuses its attention on requirements (1) and (3)—whether the Malhotras had direct and independent knowledge, and whether they had a hand in the public disclosure.

### a. Direct and independent knowledge

The Ninth Circuit has interpreted the "direct and independent knowledge" criterion as requiring knowledge that is both direct and independent. *United States ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1202 (9th Cir. 2009). To show "direct knowledge," a relator must show that "'he had firsthand knowledge of the alleged fraud, and that he obtained this knowledge through his own labor unmediated by anything else.'" *Id.* at 1202 (quoting *United States v. Alcan Elec. & Eng'g, Inc.*, 197 F.3d 1014, 1020 (9th Cir. 1999)). To show independent knowledge, a relator must show that he "[knew] about the allegations before that information [was] publicly disclosed." *Id.* However, what is more pertinent to this case is that the relator must have true "knowledge" as opposed to mere speculation or suspicion. *United States ex rel. Aflatooni v. Kitsap Physicians Servs.*, 163 F.3d 516, 525-26 (9th Cir. 1998) (information that was "speculative and suspicious" does not rise to the level of "direct and independent knowledge"). The court in *Aflatooni* held that "because the purpose of the FCA is to encourage individuals with true 'knowledge' of alleged wrongdoing to come forward and provide such information to the Government, the purposes of the Act would not be served by allowing a relator to maintain a *qui tam* suit based on pure speculation or conjecture."

ORDER- 13

*Id.* Thus, the court must determine whether, before the deposition of Jim Grace,[4] the Malhotras had "true knowledge" of Mr. Steinberg's fraud, or whether instead they had mere speculation, suspicion and conjecture. *Id.*

As a factual matter, as stated above, the court finds that the Malhotras did not have "true knowledge" of Mr. Steinberg's fraudulent kickback scheme until Jim Grace was deposed, i.e., until the information was publicly disclosed. Instead, they had only "suspicions," speculation, and conjecture, which is insufficient to confer subject matter jurisdiction under the original source exception. *Aflatooni*, 163 F.3d at 525-26. As Mr. Malhotra testified, the Malhotras had only a "gut feeling," and were just "shooting in the dark." (*E.g.*, Fandel Decl. Ex. A at 42-43, 47-48, 69, 144, 148, 178-179.) In other words, they could only speculate and conjecture about Mr. Steinberg but had no proof and no knowledge. The court makes this factual finding based on the evidence heard at the January 31, 2013, evidentiary hearing and for the reasons described in more detail above.

This finding alone is enough to hold that the court lacks subject matter jurisdiction over this case, but the court will continue its analysis in the interest of judicial economy in case this order is appealed. The court turns next to whether the Malhotras had a "hand in the public disclosure."

---

[4] The time at which the court must assess the Malhotras' knowledge must be prior to the Grace deposition. This is because the FCA requires "direct and independent knowledge," and "independent knowledge" is defined as knowledge obtained by the relator prior to the public disclosure. *See Meyer*, 565 F.3d at 1202.

ORDER- 14

### b. A hand in the public disclosure

Ninth Circuit case law establishes that, to be an original source, a *qui tam* plaintiff must have "had a hand in the public disclosure" of the allegations contained in the suit. *Johnson Controls*, 457 F.3d at 1013. That is, plaintiff's disclosure must have "triggered" the investigation leading to the publicly disclosed information. *Seal 1*, 255 F.3d at 1162 (quoting *United States ex rel. Barajas v. Northrop Corp.*, 5 F.3d 407, 411). The Plaintiff must have "played some part, whether direct or indirect, in the public disclosure of the allegations . . . ." *Id.* This "depends on the facts and circumstances of the individual case, evaluated in light of the central purpose of the Act to encourage persons with knowledge of fraud against the government to come forward with their knowledge." *Id.*

Ninth Circuit case law also requires courts to find that there is a close connection between the relator's original disclosure and the publicly-disclosed information forming the basis for his or her FCA claim. *Id.* at 1162-63. The Ninth Circuit has articulated four factors for courts to consider when making this determination: "(1) the degree to which the relator's information helped uncover the later allegations; (2) the degree to which other private actors helped uncover those allegations; (3) the degree to which the government played a role in uncovering those allegations; and (4) whether the later allegations are brought against the same entity as the earlier allegations." *Id.* at 1163.

The court finds, as a factual matter, that the Malhotras did not "trigger" the deposition of Jim Grace. The government directly testified that its decision to depose Jim Grace was based "solely" on the information and allegations in the letter from Mr. Bennett, not based on any information provided by the Malhotras. The court credits the

government's testimony more than the indirect, circumstantial, and at times inconsistent evidence offered by the Plaintiffs. When OUST heard the Malhotras' allegations against Mr. Steinberg, it took no action other than to "encourage" the Malhotras to keep looking. On the other hand, when OUST heard Mr. Bennet's allegations, it immediately took action to begin investigating Mr. Steinberg. At the evidentiary hearing, two separate OUST attorneys testified that the decision to depose Mr. Grace was triggered not by the Malhotras but by the letter OUST received from Mr. Bennet.

In addition to this finding, the court also examines the four factors listed in *Seal 1* and finds (based on substantial evidence heard at the hearing) that there is not a close enough connection between the Malhotras' disclosure to the government and the publicly-disclosed information disclosed at the Grace deposition. Three of the four *Seal 1* factors strongly favor this result, and the fourth does not directly apply. First, the Malhotras' allegations did very little to help uncover later allegations against Mr. Steinberg. In fact, it appears that OUST gave them very little credence, whereas OUST gave substantial credence to the allegations made by Mr. Bennet, which were completely independent from the Malhotras. Second, other private actors (namely, Mr. Bennett) were critical to uncovering Mr. Steinberg's fraud. This weighs in favor of Defendants. *Seal 1*, 255 F.3d at 1163. Finally, the government played a substantial role in uncovering Mr. Steinberg's fraud. OUST launched an investigation into Mr. Steinberg that had nothing to do with the Malhotras other than that it used their case to obtain a rule 2004 examination of Mr. Grace.

For these reasons, the court concludes that the Malhotras did not have a hand in the public disclosure and cannot be considered an original source under the FCA. Because of this, and because the court also finds that the Malhotras did not have "knowledge" of Mr. Steinberg receiving kickbacks prior to the Grace deposition, the court holds that it does not have subject matter jurisdiction to hear this case.

## IV. CONCLUSION

The Malhotras spent hours of their own time investigating Mr. Steinberg's fraud against the government, and for this effort they should be commended. However, their investigation does not entitle them to proceed as *qui tam* relators under the FCA. The court holds that it does not have subject matter jurisdiction over the Malhotras' *qui tam* action, GRANTS Defendants' motion to dismiss (Dkt. # 173), DISMISSES the case in its entirety, and DENIES all other pending motions as moot (Dkt. ## 164, 167, 170, 179, 182).

Dated this 5th day of February, 2013.

JAMES L. ROBART
United States District Judge